# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00077

**LASHAWNDA WRIGHT, Florida resident,** *and*

**BERNARD MYLES ALBURY, (her husband), Florida resident,**

    Plaintiffs,

v.

**ASPEN AIRPORT:ASE, a Colorado Quasi-Public Entity**

**SNOWMASS a/k/a ASPEN SKIING COMPANY, LLC, a Colorado Corporation, a/k/a ASPEN SNOWMASS;**

**SILVERTREE PROPCO, LLC, a Delaware Corporation, d/b/a WILDWOOD SNOWMASS;**

"**JOHN DOE 1**," whose true name is unknown, individually, and in his official capacity as a shuttle driver for an unknown company;

"**JOHN DOE 2**," an entity that employed John Doe 1 as a shuttle driver;

"**JOHN DOE 3**" an entity or individual responsible for snow and ice removal at ASE;

"**JOHN DOES 4 to 10**" whose true names are unknown.

    Defendants.

---

### COMPLAINT AND JURY DEMAND

---

NOW COME Plaintiff LaShawnda Wright and Plaintiff Bernard Mules Albury, her husband, and for their Complaint against Defendants demand a jury trial and state as follows:

**I.    Parties**

1. Plaintiff LaShawnda Wright is an individual residing in the State of Florida, and was a Florida resident all times relevant hereto. Plaintiff Wright was located in the State of Florida when she first became aware of the fact of her injuries, and this made the cause apparent.

2. Plaintiff Bernard Myles Albury is an individual residing in the State of Florida, and was a Florida resident at all times relevant hereto. Plaintiff Albury was located in Florida when his injuries and damages accrued and where they continue to accrue.

3. Defendant Snowmass a/k/a Aspen Skiing Company, LLC, a/k/a Aspen Snowmass (hereafter, "Snowmass") is a Colorado corporation with its principal place of business in Pitkin County, Colorado.

4. Defendant Silvertree Propco is the Delaware-based business entity which is the operates under the name Wildwood Snowmass, (hereafter, "Wildwood") at the facility located at 40 Elbert Lane, Snowmass Village, Colorado 81615

5. Defendant Aspen Airport: ASE ("ASE") is a quasi-governmental entity owned by Pitkin County, Colorado government but operated as if it were an independent private company. It is sometimes referred to as Aspen/Pitkin County Airport. Plaintiffs were at ASE when Plaintiff Wright fell on what is alleged to be a dangerous condition.

6. Defendant "John Doe 1" is a male in his approximate late 20', by estimation, who was the driver of an airport-hotel shuttle bus which Plaintiffs rode from the ASE airport to and from Wildwood Snowmass. John Doe 1 was the driver in both instances.

7. Defendant "John Doe 2" is the unidentified business entity responsible for the operation of the shuttle service which John Doe 1 served as a driver while in service of this

entity. It is not known whether this was Defendant Wildwood, Defendant Snowmass, or a yet unidentified entity.

8. Defendant "John Doe 3" is the entity responsible for removal of snow and ice from the parking lot area at ASE Airport. This is believed to have been the responsibility of the Airport Operations Security Coordinator.

9. Defendants "John Doe 4 to 10" are other unidentified individuals, entities, or a combination thereof who further fact gathering and discovery is needed to determine the identity of. These Does 4 to 10 represent as of yet unidentified persons and entities that caused or contributed to Plaintiffs' injuries.  This could possibly include, for instance: specific individuals employed by John Doe 3 to perform groundskeeping; the owner of the shuttle itself John Doe 1 drove; the entity responsible for establishing the policies, training and hiring of another Defendant;  or one in a role not yet ascertainable to Plaintiffs.

10. Plaintiffs note an intent to seek limited discovery to ascertain the precise entity rather than to expend unnecessary time or resources of any person or entity that is a proper subject of this lawsuit, as this is necessary to confirm representations made prior to litigation and prevent waste or delay.

**II.  Jurisdiction and Venue**

11. Jurisdiction is proper under diversity jurisdiction principles of United States law, 28 U.S.C. § 1332. Jurisdiction is proper in this Court as there is over $75,000.00 in controversy and all Plaintiffs are citizens of different states than all Defendants.

12. Jurisdiction is also proper under federal questions principles including per alleged violations by Defendants being actionable under 42 U.S.C. §§ 2000a(a)(2), (b)(1), and/or other

3

parts of the Civil Rights Act of 1964 prohibiting racial discrimination or segregation in places of a public accommodation, thus making jurisdiction proper under 28 U.S.C. §§ 1331 and 1361.

13. Under principles of supplemental jurisdiction, Plaintiffs may properly bring their legal claims before this Court which are related to their claims of discriminatory conduct by an innkeeper and 28 U.S.C. §§ 1331 and 1367.

14. No party is improperly of collusively named in this case as Defendant. 28 U.S.C. § 1359.

15. Venue is proper in this Court under 28 USC § 1391.

### III. Statement of the Facts

16. Plaintiffs reside in Boynton Beach, Florida and are lifelong or nearly lifelong residents of Florida and had either never seen snow in person or never encountered snow accumulation prior to January 2020.

17. Plaintiffs are not Caucasian but African American and Bahamian American--both are dark skinned persons of dark brown to black complexion. Plaintiff Wright has a noticeable accent, which is due to her mother being a native born Bahamian.

18. Plaintiffs visited the State of Colorado on or about January 2020 with the intent of a celebration of Plaintiff Albury's birthday including skiing in the Aspen area. The Plaintiffs elected to reserve a room and accommodations within the area attributable to Defendant Snowmass, and specifically at Defendant Wildwood.

19. Plaintiffs flew from Florida to Colorado with the final leg of their flight landing at the airport of Defendant ASE. At the conclusion of the trip, they departed from the same airport.

20. Plaintiffs were present at sea-level elevation while in Florida. When they arrived at ASE, they were present at approximately 7,820 feet above sea-level.

21.     Plaintiff Wright was in her mid 30's at the time of this trip to Aspen but there was no occasion to walk on snow or ice in the past while she resided in Florida; nor had she ever engaged in ice skating on any surface.

22.     Plaintiffs, upon landing at the airport of Defendant ASE, proceeded to rent a car before driving to Wildwood.  Soon they realized that with their hotel reservation including an airport shuttle there was no need to also pay for a rental car. They decided to return the vehicle some days early.

23.     The shuttle between ASE and Wildwood was a fixed loop that did not require special reservations but operated throughout the day along a known pre-planned route.    The price of the shuttle was required to be paid to reserve a room at Wildwood.

24.     Wildwood offers and advertises the shuttle service to/from ASE Airport in conjunction with a neighboring hotel. This is seen in that the same shuttle with the same driver was responsible for transport between both resorts and ASE.

25.     After dropping their rental vehicle back at ASE, Plaintiffs intended to ride back to Wildwood on the airport shuttle provided through the cost of their stay at Wildwood.

26.     Two luggage agents who were employed by ASE were seen assisting persons entering the airport in order to check their luggage.  Plaintiffs asked these luggage agents where the shuttle for Wildwood was located. The agents pointed to a specific part of the sidewalk near a curved parking lot, and told Plaintiffs to wait there for the shuttle.

27.     Soon a shuttle arrived, but it came to rest at a location past where the ASE agents had directed Plaintiffs to wait. It then backed into a parking spot and parked at a 45 degree angle to the curb. Plaintiffs heard the driver confirm this was the shuttle for Defendant Wildwood.

28. Unbeknown to Plaintiffs, the shuttle had parked atop a large patch of ice that covered an area of the parking lot stretching from the sidewalk curb to the door of the shuttle. It appeared to Plaintiffs that this large sloping area was a sort of ramp that had been built purposefully and was an unchanging feature of the terrain.

29. Plaintiff Wright was in closest position to board the shuttle and undertook to take several steps toward the open door. She walked 4 to 5 feet toward the shuttle and was approximately halfway to the shuttle door.

30. Mrs. Wright abruptly slipped on the ice and fell backward. She attempted to brace herself by extending her left arm toward the ground. The impact was jarring and unexpected, as she had believed to be walking on a paved wheelchair ramp/incline and was wearing snow boots while walking with care.

31. During this moment, the driver Defendant John Doe 1 loaded luggage from the other 4 passengers onto the shuttle.

32. John Doe 1 never acknowledged or paid any attention toward Plaintiffs from the time he parked at ASE through the remainder of the trip to Snowmass and Wildwood.

33. Plaintiff Wright's fall was noticed by the other 4 passengers, one of which helped her to her feet along with Plaintiff Albury. She remained on the ground for a prolonged and noticeable time before standing with this assistance.

34. John Doe 1 did not attempt to assist or inquire whatsoever if Plaintiff was hurt or desired medical attention. He simply ignored the situation and attended to baggage for the white passengers, then got into the driver's seat, waited silently aloof to Plaintiffs while they boarded, then closed the door and drove away.

35. The Plaintiffs told John Doe 1 that they were staying at Defendant Wildwood. They made conversation with the other passengers and multiple times the topic of the fall was discussed in close proximity to the driver. However, his attention was never affected even to the level of his care for the white passengers' luggage.

36. John Doe 1 was approaching Wildwood but did not stop and drove directly past it. The driver did not make any effort to get Mrs. Wright any assistance whatsoever. He did not inquire whether Mrs. Wright needed or wanted medical assistance, did not radio to hotel staff about the fall, did not direct them to staff at either hotel, nor do anything to acknowledge their existence except tell them to get off of the shuttle.

37. John Doe 1 assisted other passengers with all of their luggage and, despite having no option but to turn around and drive once again directly in front of Wildwood, told the Wrights to get out of the shuttle. They got out and had no choice but to walk the 300-400 feet while the white passengers were dropped off perhaps 15 feet away from the door to their hotel.

38. It would have not required more than 30 seconds at most to stop in front of the Wildwood resort and allow the Plaintiffs to disembark. No explanation was offered by John Doe 1 when the Plaintiffs questioned why they were being told to get off the shuttle, as he was inevitably going to drive past the Wildwood and he knew Mrs. Wright had fallen only minutes prioer while walking approximately 10 feet to the shuttle door.

39. Plaintiffs again encountered the same shuttle driver when they were leaving for the airport several days later.

40. Plaintiffs stood outside along with all of their luggage in the spot where Wildwood staff instructed them to wait for the shuttle. However, John Doe 1 drove past Plaintiffs as if they did not exist. The Wildwood staff then confirmed that he should have

stopped right in front of the hotel, stated confusion over why he drove past, and undertook to radio him to tell him to come back for the Plaintiffs.

41. John Doe 1's actions and inattention to Plaintiffs caused them to feel embarrassed, humiliated, and unwelcome. They felt compelled to walk the 300-400 feet to the other hotel with luggage in tow as to ensure they would be able to get on the shuttle. They did not think the driver would otherwise pick them up, even after being called to do so.

42. He proceeded to load all the white passengers' luggage aboard the shuttle which they had left unattended while boarding the shuttle. It was only after he finished this that he acknowledge Plaintiffs who had been patiently standing with luggage in tow.

43. Plaintiffs' trip to Aspen, by the actions of John Doe 1, left them feeling out of place, unwelcome, and unimportant because of their appearance and fact of being a different race than the white passengers.

44. After the fall at ASE, through the remainder of the trip Plaintiff Wright did not have occasion or thought to seek medical treatment or evaluation related to the fall. This was due to an onset of extreme and unrelenting altitude sickness. This was debilitating and incapacitating, such that she did not attempt to go skiing and was unable to think of anything else.

45. It was only approximately one week or more after returning to Florida when Plaintiff experienced worsening pain. She realized her wrist was increasingly sore and not improving. The fall at ASE was not on her mind as the altitude sickness was all that stood out about bodily injury at first.

46. In other words, it was not immediately apparent to Mrs. Wright nor did she reasonably have occasion to know of her injuries from the fall. This circumstance would have been different if John Doe 1 offered any assistance to the Plaintiffs.

47. The onset of pain in the following weeks caused Plaintiff to go to the emergency room on February 28, 2020. It was determined from x-rays that she would require surgery, and this would have been seen right away if John Doe 1 made effort to inform his superiors of the fall. In fact, the training documents given to employees of Defendant Snowmass speak in certain terms to the requirement of employees to inform management immediately if there is any incident or injury involving a guest whatsoever, and also to give assistance to injured guests.

-**Damages summary**

48. Mrs. Wright has underwent four surgeries – two to her left wrist and two to her left shoulder, as well as abundant physical therapy and follow up doctor visits.

49. As of October 28, 2021, Plaintiff's medical bills totaled over $403,000.00. and since that time continue to accrue.

50. Plaintiff also lost her job as the recovery period grew far beyond her accrued leave time, vacation days, and sick days. Restrictions on her employment relating to direct risk to her recovery from weightbearing activity.

51. Plaintiff may never regain full movement in her left shoulder or wrist, per her surgeons' most recent evaluations. She also has permanent nerve damage to her left wrist.

52. Plaintiff has not worked for about 1.5 year, and prior to that faced a greatly reduced schedule. She has no health insurance after losing her job.

53. Plaintiffs ultimately saw both of them lose their employment and benefits due to the time and extent of care needed by Mrs. Wright. Plaintiff Albury has suffered greatly reduced income and the abundant time and energy needed by a recovering Plaintiff Wright has been a difficult strain on their lives and relationship.

54. Plaintiffs have had to choose between paying for basic necessities due to their damages. For instance, in Fall 2021, they had to choose to pay rent for the month over making car payment—they could not afford both. Due to this choice the car was repossessed and now Mrs. Wright is without her own means of transportation.

55. Plaintiff is less than 40 years old but had to incur hundreds of thousands of dollars in medical billing to address the injuries suffered, abundant pain and suffering, and substantial lost wages as well as a continued lack of employment and health insurance. Plaintiff Wright has numerous scars visible on her arms and wrist.

56. Both Plaintiffs encountered and continue to face embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

57. Plaintiffs assert that a white passenger would have been directed to get immediate medical treatment upon suffering a fall like that of Plaintiff Wright.

58. The sidewalk area and parking lot at ASE were not clear of snow and ice despite over 24 hours of sunshine and only middling flurries the day prior to that.

59. The limited signage about snow that is at ASE is not and was not sufficient to warn someone unfamiliar with winter weather of the possibility of ice accumulation several inches thick without there being active snowfall for a significant time prior.

60. However, by the time this case reaches trial Plaintiffs' combined economic damages will be toward $1,000,000.00. This is before considering the non-economic damages or the amount that Mrs. Wright is entitled due to permanent injuries and disfigurement.

61. If John Doe 1 had given any assistance or guidance to the Plaintiffs, it is likely that Plaintiff Wright would be facing a significant decrease in pain and recovery time, much less along with less bills and costs for both Plaintiffs.

IV. **Claims for Relief**

**FIRST CLAIM - COLORADO PREMISES LIABILITY ACT**
**(or negligent maintenance of property)**
**Defendant ASE and John Doe 3**

62. Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

63. Plaintiffs were injured and *one* cause of this injury was the failure to maintain the parking lot area at ASE. This occurred as the result of an expected and known accumulation of the ice.

64. Defendant Aspen/Pitkin Airport had a duty to prevent Plaintiffs from facing unreasonable danger in the snow and ice on the parking lot of the airport

65. ASE knew that persons who first saw snowfall experienced it in the area where Plaintiff Wright fell, and did so on a regular basis after flying to Aspen to go on vacation at a local ski resort.

66. Per a Pitkin County job description dated January 2020, this job entailed responsibilities including: "Monitors, coordinates, and **performs all snow removal operations**; makes strategic decisions based on snowfall; **operates heavy equipment for snow removal**

**from** all runways, taxiways, apron areas, and **customer parking areas;** communicates with ATCT and aircraft; conducts runway friction tests." (emphasis added).[1]

67. The accumulation of the amount of snow and ice present was an unreasonable risk to the health and safety of the public and including vacationing persons from outside Colorado unfamiliar with snow and ice and the danger these conditions can create.

68. Plaintiff Wright and her husband Plaintiff Albury are the kind of persons one would expect to be less than fully informed of such dangers and thus fall with in the class of those one would expect to see injured in these circumstances, while at this location.

69. ASE knew and at very minimum should have known of the persistent accumulated snow and ice. This is due to the more than 24 hours passing since any precipitation occurred at all; and only relative minimal snowfall occurring during the prior week or more.

70. The doctrine of sovereign immunity is inapplicable and the resulting condition where Plaintiff fell was one which a municipality may properly be held liable for.

71. Without the benefit of sovereign immunity, ASE is liable regardless of if the parking lot area where Plaintiff fell will be deemed on or off the ASE property.

72. By undertaking to clean up the area between the sidewalk and parking lot whatsoever, ASE faced a continuing obligation to protect foreseeable injured persons such as Plaintiff Wright.

73. The type of injury was foreseeable. The parking lot was dangerous due to a defect in performance of maintenance rather than defect in design.

74. The dangerous condition of the parking lot was due to the proximate act of the ASE personnel in failing to provide shuttle drivers with an adequate safe area to park, and made

---

[1] *Available at* https://records.pitkincounty.com/WebLink/DocView.aspx?id=316382&dbid=0&repo=LFRecords&cr=1

worse by the affirmative statements of luggage handling personnel who told Plaintiffs a location to stand which actually put them at greater risk.

75. The amount of snow and ice accumulated was unreasonable in the circumstance Plaintiffs encountered, that of vacationers without winter weather experience along with a lack of accumulation 24 hours or more prior to the fall of Plaintiff Wright.

76. The fall caused injuries to Mrs. Wright not discovered immediately but injury which later became apparent and were severe and permanent.

77. This fall caused Mrs. Wright to suffer damages and Mr. Albury later suffered damages as a result.

78. According to Pitkin County Code, 10-16-070, Defendant ASE required all persons operating commercial transport vehicles on the ASE premises to pay a fee. Code section 10-28-110 establishes further regulations for commercial vehicles that pick up or drop off passengers at ASE.

79. Defendant ASE is liable for the damages Plaintiffs suffered due to the unsafe condition of the airport parking lot area.

## SECOND CLAIM – NEGLIGENCE
### (innkeeper / carrier standard of care)
### Defendants Wildwood Snowmass; John Does 1 & 2

80. Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

81. Defendant Wildwood owed the Plaintiffs a heightened level of care as an innkeeper for Plaintiffs as guests.

82. Defendants John Doe 1 & 2 owed the Plaintiffs a heightened level of care as a driver and owner of a public facing transportation company and/or a contract carrier.

83. Plaintiffs were entitled to Defendants undertaking care beyond the bare minimum that may be reasonable under other circumstances not involving an innkeeper or carrier.

84. This includes a duty to mitigate guests' and passengers' harm and any continued risks from injuries that are made known, as Plaintiff's fall was to John Doe 1.

85. John Doe 1 did nothing to help Plaintiffs in any way. He failed to meet the burden on him and, by serving as an employee/agent, the burden of John Doe 2 to mitigate likely effects of injuries known to occur on while a person is a guest or passenger.

86. Defendants failed to account for the likelihood that persons unfamiliar with mountains and winter weather are regularly vacationing to Aspen and cannot be expected to recognize ice and snow as a native Coloradoan would.

87. John Doe 1 put the Plaintiffs at unnecessary risk by refusing or ignoring the Plaintiffs and thereby denying the opportunity for Mrs. Wright to get immediate medical attention or know that she was in fact injured to the extent it could be seen in imaging.

88. John Doe 2 and John Doe 1 are either subject to the duty of an innkeeper to protect guests, or the duty of a contract carrier to protect passengers. This would include the minimum act of informing the Plaintiffs of the presence of ice, or parking somewhere safer in that same parking lot area.

89. It is a likely that immediate intervention would have eliminated one or more surgeries and significantly reduced recovery time, and increased the likelihood that the Plaintiffs one or both might avoid losing their jobs and insurance benefits.

90. The Plaintiffs are entitled to the full amount of their damages attributable to Defendant Wildwood, John Doe 1 and John Doe 2's malfeasance and/or nonfeasance.

91. Defendants are liable to Plaintiffs for the amount they caused unnecessary damages and avoidable worsening of injuries to Plaintiffs.

### THIRD CLAIM - NEGLIGENCE
### (hiring/training/retention/supervision)
### Defendants Wildwood Snowmass; Snowmass Aspen; and John Does 2, 4-10

92. Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

93. In addition, Defendants Wildwood and John Doe 2, and possibly others, had a duty to ensure John Doe 1 knew his inaction in a circumstance as Mrs. Wright faced could have unacceptable detrimental consequences to that person's life and recovery.

94. Defendants violated a duty to Plaintiffs by failing to train, supervise, reprimand, or hire shuttle drivers properly as to sufficiently ensure their safety.

95. Defendants did not adequately train, supervise, or punish John Doe 1 such that it was a violation of a duty to Plaintiff to fail to ensure the shuttle driver on a mountaintop would be able to act competently in the face of a passenger's injury.

96. For instance, failing to train and supervise a shuttle driver on what to do when observing a guest/passenger have a fall occur; to not ignore guests/passengers who say they are in pain; to park in safe areas during pickups; or to treat black guests/passengers the same and no less than all other guests/passengers.

97. Failure to so adequately train, supervise, reprimand and/or terminate John Doe 1 is a direct harm to Plaintiffs by their experience of apparent racial bias resulting in the denial of full and fair benefit of the accommodations provided by Defendant Wildwood.

98. Plaintiffs are therefore entitled to recover all damages attributable to Defendants' negligent training, supervision, control and discipline as to the driver John Doe 1.

# FOURTH CLAIM –VIOLATION OF CIVIL RIGHTS ACT OF 1964, TITLE II

### Defendants Wildwood Snowmass; Snowmass Aspen

99. Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

100. Plaintiffs are persons within the meaning of 42 USC § 2000a(a).

101. Defendant Wildwood Snowmass is a place of public accommodation within the meaning of 42 USC § 2000a(b)(1) because of its status as a lodging.

102. Defendant Wildwood is therefore by statuory definition an operation affecting commerce under 42 USC § 2000a(c).

103. Defendant Wildwood Snowmass is physically located within Defendant Snowmass Aspen, which also holds itself out as serving patrons of Defendant Wildwood. Defendant Snowmass Aspen is therefore a place of public accommodation. 42 USC § 2000a(b)(4).

104. Defendant Snowmass Aspen is therefore also by statutory definition an operation affecting commerce under 42 USC § 2000a(c).

105. Defendant John Doe 2 holds itself out as serving patrons of Defendant Wildwood, or is possibly not a separate entity at all from Defendant Wildwood. It therefore is an operation affecting commerce under 42 USC § 2000a(c).

106. Plaintiffs were denied full and equal enjoyment of the services, facilities, privileges, advantages, and/or accommodations of Defendants Wildwood Snowmass and Aspen Snowmass.

107. As is shown by the actions of John Doe 1, Plaintiffs' race, color, and/or national origin caused them to be treated less than equal to other guests/passengers who were white. The Plaintiffs were not provided equal enjoyment of the

108. The actions of John Doe 1 are attributable to Wildwood Snowmass through agency principles, employment laws, respondeat superior, or otherwise.

109. Defendant Aspen Snowmass advertises that "At Aspen Snowmass, our approach to promoting racial justice is to always continue learning; to teach employees and guests how to be anti-racist; to create a more welcoming environment for all people of color; and to use our influence to promote equity."[2]

110. A letter authored by the President & CEO of Aspen Skiing Company published on the Aspen Snowmass website states:

> [. . .] we acknowledge the deep injustices and systemic racism embedded in everyday life in America. This **inequity appears everywhere: in employment and economic opportunity, in healthcare**, [. . .] We are not naïve as to why skiing and ski towns are seen as the epitome of white privilege: a lack of economic opportunity keeps many visitors from joining us; our community does not provide the range of employment needed to develop a truly diverse community; finally, though our residents are extremely open for those who actually make it here, there is a **wide spread perception that our lack of diversity means we will not welcome difference**. This must change.[3]

111. Defendants are engaging in deceptive behavior toward the public by profiting off such statements. Prior to their trip to Snowmass Aspen and their stay at Wildwood Snowmass, Plaintiffs *had* the means to visit; however, they found that the Defendants *did not* welcome difference; in fact, Defendants' actions and failures to act are *why* Plaintiffs now face inequity in economic opportunity, employment, and healthcare.

---

[2] "Racial Justice" *available at* https://www.aspensnowmass.com/discover/who-we-are/racial-justice
[3] *Emphasis added.* "We Commit" *available at* https://www.aspensnowmass.com/discover/experiences/stories/we-commit

112. Plaintiffs are entitled to injunctive relief against Defendants to address this discrimination.

## V. Jury Demand

### PLAINTIFFS DEMAND TRIAL BY JURY

## VI. Prayer for Relief

**WHEREFORE**, Plaintiffs prays for entry of judgment in their favor and against Defendants on all Counts and causes of action, including:

(i) Injunctive relief ordering Defendants to alter the content of their websites which falsely claim to be champions of racial justice while in private they are dismissive of claims by people like the Plaintiffs;

(ii) An award of damages to compensate for all bodily injuries, medical expenses, disfigurement, permanent impairment, and otherwise allowable for physical harm;

(iii) An award of damages to compensate for all economic losses and costs incurred by Plaintiffs including lost wages and benefits, and other actual damages incurred;

(iv) An award of damages for all noneconomic harms, pain and suffering, loss of enjoyment of life, and mental anguish of Plaintiffs and any other such damages suffered;

(v) An award of punitive or exemplary damages if supported by the facts and evidence developed on the record;

(vi) An award of attorneys fees as contemplated by 42 U.S.C. § 2000a-3(b) and/or as otherwise awardable under applicable law;

(vii) For their costs and expenses incurred in pursuit of this action;

(viii) Pre- and post-judgment interest at the prevailing rate;

(ix) For such other and further relief as may become supported by the evidence, and as this Court finds just and proper in the circumstances.

DATED January 11, 2022[*]

                                               Respectfully submitted,

                                               *S/ Joseph Ryan Riegerix*
                                               Joseph Ryan Riegerix, Atty No. 53633
                                               THE COLORADO JUSTICE-RX
                                               450 14th Street
                                               Denver, CO 80204
                                               720-576-6095
                                               303-358-1062 (direct)
                                               j@justice-rx.co
                                               *Attorney for Plaintiffs Lashawnda Wright and Bernard Myles Albury*

---

[*] Following case opening on January 11, 2022 and subsequent technical issues filing complicated and delayed.