# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00077-DDD-GPG

LASHAWNDA WRIGHT; and
BERNARD MYLES ALBURY

      Plaintiffs,

v

BOARD OF COUNTY COMMISSIONERS OF PITKIN COUNTY, COLORADO; and
SILVERTREE PROPCO, LLC d/b/a WILDWOOD SNOWMASS

      Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

NOW COME Plaintiff LaShawnda Wright and Plaintiff Bernard Myles Albury, her husband, and for their Second Amended Complaint against Defendants demand a jury trial and state as follows:

## I.    Parties

1.    Plaintiff LaShawnda Wright is an individual residing in the State of Florida, and was a Florida resident all times relevant hereto. Plaintiff Wright was located in the State of Florida when she first became aware of the fact of her injuries, and this made the cause apparent.

2.    Plaintiff Bernard Myles Albury is an individual residing in the State of Florida, and was a Florida resident at all times relevant hereto. Plaintiff Albury was located in Florida when his injuries and damages accrued and where they continue

to accrue.

3.      Defendant Board of County Commissioners of Pitkin County, Colorado, (hereafter, "Board") is a governmental entity. It owns the Aspen/Pitkin County Airport ("ASE") property. Upon information and belief, all functions of ASE are undertaken and directed by the Board.

4.      Defendant Silvertree Propco is the Delaware-based business entity which operates under the name Wildwood Snowmass, (hereafter, "Wildwood") at the facility located at 40 Elbert Lane, Snowmass Village, Colorado 81615

5.      "John Doe 1" is a male in his approximate late 20s, by estimation, who was the driver of an airport-hotel shuttle bus which Plaintiffs rode from the ASE airport to and from Wildwood Snowmass. John Doe 1 was the driver in both instances. Upon information and belief, John Doe 1 was an employee or agent of Defendant Wildwood acting in the course and scope of his employment or agent at the time of the events described herein.

## II.      Jurisdiction and Venue

6.      Jurisdiction is proper under diversity jurisdiction principles of United States law, 28 U.S.C. § 1332. Jurisdiction is proper in this Court as there is over $75,000.00 in controversy and all Plaintiffs are citizens of different states than all Defendants.

7.      Jurisdiction is also proper under federal questions principles including per alleged violations by Defendants being actionable under 42 U.S.C. §§ 2000a(a)(2),

(b)(1), and/or other parts of the Civil Rights Act of 1964 prohibiting racial discrimination or segregation in places of a public accommodation, thus making jurisdiction proper under 28 U.S.C. §§ 1331 and 1361.

8. Plaintiffs have complied with the jurisdictional requirements of the Colorado Governmental Immunity Act ("CGIA") with respect to suit against the Board. Specifically:

a. On July 10, 2020, prior counsel for Plaintiffs sent a "Notice of Claim" to Caroline Bonynge upon information and belief by certified mail, return receipt requested or, at least, by certified mail.

b. The Notice of Claim is incorporated herein by reference and is on file at Doc. 30-1, pp. 3-7.

c. The substance of the Notice of Claim substantially complied with C.R.S. § 24-10-109(2).

d. At that time the Notice of Claim was sent, Ms. Bonynge was an employee of the Board.

e. Specifically, Ms. Bonynge was the ASE Director of Operations & Safety.

f. Upon information and belief, this role included a "risk management" function, *i.e.*, responsibilities related to the handling, investigation, and response to personal injury claims.

g. Upon information and belief, the Board trained Ms. Bonynge to report the receipt of documents like the Notice of Claim to the Clerk and Recorder and/or

County Attorney.

h. Upon information and belief, Plaintiffs' prior counsel had reason to believe Ms. Bonynge had actual or implied authority to accept the Notice of Claim for the Board in her capacity as the Board's agent.

i. Upon information and belief, on July 27, 2020, the Board responded to Plaintiffs' prior counsel through another agent, ACE Property and Casualty Insurance Company.

j. Nothing about the method, timing, or addressee of the Notice of Claim caused any prejudice to the Board.

k. The method, timing, and addressee of the Notice of Claim allowed the parties to at least begin to explore the possibility of settlement.

l. The method, timing, and addressee of the Notice of Claim gave the Board a full opportunity to investigate Plaintiffs' claims, remedy the alleged conditions, and prepare its defenses.

m. The Notice of Claim therefore fulfilled all of the intent and purposes underlying C.R.S. § 24-10-109.

n. It could reasonably and objectively be inferred from the Notice of Claim that Ms. Wright was claiming monetary damages.

o. Facts giving rise to the CGIA's waiver of sovereign immunity for the Board in relation to these claims are discussed below.

p. Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the

express purpose of clarifying, extending, and/or modifying the law allowing for substantial compliance with the CGIA notice requirements rather than strict compliance, specifically for the purpose of establishing that (i) notice mailed by certified mail by the deadline has met the deadline, (ii) notice to a government facility's Director of Operations & Safety constitutes notice to the governing entity she works for, and (iii) the Notice of Claim sent in this case substantially complies with the requirements such that the Court can exercise jurisdiction in a case like this one. The existing law related to substantial (rather than strict) compliance with the C.G.I.A. notice requirement is described in multiple cases, but especially, *e.g.*, *Finnie v. Jefferson County Sch. Dist. R-1*, 79 P.3d 1253 (Colo. 2003); and *Bradley v. School Dist. No. 1 in City and Cty. of Denver*, 504 P.3d 979, ¶¶ 2-3 (Colo. App. 2021). On the topic of the notice filing date, the Colorado Supreme Court has held that a C.G.I.A. notice is effective upon mailing by registered mail, which Colorado statute defines to include standard certified mail. *Regional Transp. Dist. V. Lopez*, 916 P.2d 1187 (1996). The C.G.I.A. notice statute was later amended alongside several other technical updates to various notice statutes to add the words "or certified mail, return receipt requested," but the definition of "registered mail" in C.R.S. § 2-4-401 was never amended to add the words "return receipt requested" and continues to define certified mail as a form of registered mail. Plaintiffs therefore seek to extend the holding in *Lopez* to apply to this new statutory language, *i.e.*

interpreting the new statute to allow a notice to still be effective upon mailing by what the U.S.P.S. calls registered mail, certified mail, or certified mail, return receipt requested, and finding no legislative intent to overrule or abrogate *Lopez*.

q.  Mr. Albury did not send a separate Notice of Claim through prior counsel, and Ms. Wright's Notice of Claim did not expressly name Mr. Albury as a claimant.

r.  However, the Notice does (i) identify Mr. Albury as Ms. Wright's husband, (ii) state that Mr. Albury was traveling with Ms. Wright, (iii) state that Ms. Wright was unable to participate in activities on her joint trip with Mr. Albury, and (iv) state that Ms. Wright's injuries continued to cause physical disability.

s.  It could reasonably and objectively be inferred from these statements and others in the Notice that Mr. Albury would have derivative claims resulting from the injuries to Ms. Wright.

t.  Mr. Albury brings this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of reversing or modifying the law described/held in, *e.g.*, *Smith v. Winter*, 934 P.2d 885 (Colo. App. 1997), which held that a plaintiff who brings a derivative loss of consortium claim against a governmental entity must separately send a C.G.I.A. notice of claim. Mr. Albury also seeks in good faith to extend the standard stated *Bradley*, *supra.*, to apply the "reasonably and objectively inferred" standard to all elements of a C.G.I.A. notice and all derivative claims. Mr. Albury seeks a holding that, where an injured person's

notice identifies their spouse as such in a C.G.I.A. notice, and where the notice describes injuries that must have interfered with the injured person's relationship with their spouse or their ability to contribute to household management, the spouse's derivative claims can be reasonably and objectively inferred in satisfaction of the C.G.I.A.'s notice requirement.

9. No party is improperly or collusively named in this case as Defendant. 28 U.S.C. § 1359.

10. Venue is proper in this Court under 28 USC § 1391.

### III.  Compliance with Statute of Limitations and Relation Back

11. The events that gave rise to this case, as described further below, occurred on January 11, 2020.

12. On January 11, 2022, Plaintiffs' prior counsel, Joseph Riegerix, attempted to file Plaintiffs' original Complaint in this case.

13. As set forth in Doc. Nos. 3 and 7, e-filing of the original Complaint was not completed because of technical problems experienced by Mr. Riegerix.

14. Upon information and belief and as explained in Doc. Nos. 3 and 7, these technical problems arose when Mr. Riegerix temporarily lost access to his ECF account because of issues surrounding his separation from his former employer.

15. As a result, Plaintiffs' case was administratively closed.

16. Within days, Mr. Riegerix regained access to the ECF system and filed a motion asking the Court to reopen the case and accept Plaintiffs' Complaint. (Doc.

3.)

17.     Mr. Riegerix also successfully completed e-filing of the original complaint and associated documents the following day. The Complaint was dated (*nunc pro tunc*) January 11, 2022. (Doc. 4.)

18.     The Court granted Plaintiffs motion. (Doc. 7.)

19.     The ECF Docket Sheet reflects that this action was commenced on January 11, 2022.

20.     Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of clarifying, extending, and/or modifying the law as explained in this paragraph. Specifically, established 10th Circuit precedent holds that a federal court sitting in diversity applies state law for statute of limitations purposes. *E.g.*, *Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709 (2005). State law determines when an action is commenced for statute of limitations purposes. *Id*. For statute of limitations purposes, an action is commenced in Colorado as governed by the Colorado Rules of Civil Procedure. *E.g.*, *Malm v. Villegas*, 342 P.3d 422 (Colo. 2015). C.R.C.P. 3 states that an action is commenced when, as relevant to this case, the complaint is filed. And C.R.C.P. 121, § 1-26(14)(a) states that "[u]pon satisfactory proof that E-Filing or E-Service of a document was not completed because of: … (3) other technical problems experienced by the filer or E-System Provider, the [C]ourt may enter an order permitting the document to be filed *nunc pro tunc* to the date it was first attempted to be sent electronically." Plaintiffs are unaware of any

published case directly addressing a situation like this one, but expressly and in good faith request the extension of existing law as explained above to reach a holding that Plaintiffs complied with the applicable two-year statute of limitations.

21.   Next, the original Complaint named "Aspen Airport:ASE" as a defendant instead of correctly naming Defendant Board.

22.   There is no legal entity, with capacity to be sued, called "Aspen Airport:ASE" and there never has been.

23.   Despite this mistaken naming, Plaintiffs' prior counsel issued a summons to the following:

Pitkin County
Aspen/Pitkin County Airport: ASE
530 East Main Street
Aspen, CO 81611

24.   There is also no legal entity, with capacity to be sued, called "Pitkin County" and there never has been.

25.   Both "Pitkin County" and "Aspen Airport:ASE" are not independent legal entities separate and distinct from Defendant Board.

26.   Defendant Board is, and always has been, the real party in interest as to claims against employees and agents working for "Pitkin County" or "Aspen Airport:ASE."

27.   Defendant Board is, and always has been, the real party in interest as to claims for dangerous conditions at the Aspen Airport.

28.   All functions of "Aspen Airport:ASE" are undertaken and directed by

Defendant Board. (Doc. 30-1.)

29.    Upon information and belief, Defendant Board has known since it was served with the original Complaint, purportedly against and served on "Aspen Airport:ASE," that it would have been sued but for the original Complaint mistakenly naming "Aspen Airport:ASE" as a defendant instead of Defendant Board. (*See*, *id.*)

30.    Upon information and belief, Defendant Board was not prejudiced in the least by this mistake because:

    a. Defendant Board received actual notice of Plaintiffs' claims as described above in Paragraph 8;

    b. Defendant Board's insurance carrier or third-party administrator responded to that notice and had the opportunity to investigate Plaintiffs' claims and collect evidence;

    c. This case is only beginning, so Defendant Board has not missed out on any discovery or other substantive or procedural rights because of the original Complaint's mistaken naming; and

    d. Defendant Board has, in fact, participated in this case from the outset, filing documents, including a motion to dismiss, in this case under the admitted misnomer, "Aspen Airport:ASE."

31.    Defendant Board's prior counsel demanded the dismissal of "Aspen Airport:ASE" as a defendant.

32.    Plaintiffs, through prior counsel, complied, but dismissed that misnomer

entity without prejudice.

33. Plaintiffs' prior counsel then became non-responsive, forcing Plaintiffs to find new counsel.

34. Soon after the undersigned entered our appearance on behalf of Plaintiffs, Plaintiffs amended their Complaint with the permission of the Court to add Defendant Board to the case in the place of the formerly listed defendant "Aspen Airport:ASE."

35. Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of clarifying, extending, and/or modifying the law as to relation back of amended complaints under F.R.C.P. 15(c)(1)(C); *Garrett v. Fleming*, 362 F.3d 692 (10th Cir. 2004); and other law cited in Defendant Board's recent Motion to Dismiss (Doc. 98) on the issue of relation back. Specifically, Plaintiffs seek a finding that the law cited by Defendant Board is distinguishable from the present facts. And Plaintiffs seek an extension of F.R.C.P. 15(c)(1)(C) to allow for relation back of this Second Amended Complaint to the *nunc pro tunc* filing date (January 11, 2022) of their original Complaint in the factual scenario described above, notwithstanding prior counsel's dismissal of the misnamed defendant without prejudice.

## IV.   Statement of the Facts

36. Plaintiffs reside in Boynton Beach, Florida and are lifelong or nearly lifelong residents of Florida and had either never seen snow in person or never encountered snow accumulation prior to January 2020.

37.     Plaintiffs are not Caucasian but African American and Bahamian American—both are dark skinned persons of dark brown to black complexion. Plaintiff Wright has a noticeable accent, which is due to her mother being a native-born Bahamian.

38.     Plaintiffs visited the State of Colorado on or about January 2020 with the intent of a celebration of Plaintiff Albury's birthday including skiing in the Aspen area. The Plaintiffs elected to reserve a room and accommodations at Defendant Wildwood.

39.     Plaintiffs flew from Florida to Colorado with the final leg of their flight landing at the ASE airport of Defendant Board. At the conclusion of the trip, they departed from the same airport.

40.     Plaintiffs were present at sea-level elevation while in Florida. When they arrived at ASE, they were present at approximately 7,820 feet above sea-level.

41.     Plaintiff Wright was in her mid-30's at the time of this trip to Aspen but there was no occasion to walk on snow or ice in the past while she resided in Florida; nor had she ever engaged in ice skating on any surface.

42.     Plaintiffs, upon landing at the ASE airport, proceeded to rent a car before driving to Wildwood. Soon they realized that with their hotel reservation including an airport shuttle, there was no need to also pay for a rental car. They decided to return the vehicle some days early.

43.     The shuttle between ASE and Wildwood was a fixed loop that did not

require special reservations but operated throughout the day along a known pre-planned route. The price of the shuttle was required to be paid to reserve a room at Wildwood.

44.     Wildwood offers and advertises the shuttle service to/from ASE Airport in conjunction with a neighboring hotel. This is seen in that the same shuttle with the same driver was responsible for transport between both resorts and ASE.

45.     After dropping their rental vehicle back at ASE, Plaintiffs intended to ride back to Wildwood on the airport shuttle provided through the cost of their stay at Wildwood.

46.     Two luggage agents who were employed by Board were seen assisting persons entering the airport in order to check their luggage. Plaintiffs asked these luggage agents where the shuttle for Wildwood was located. The agents pointed to a specific part of the sidewalk near a curved parking lot, and told Plaintiffs to wait there for the shuttle.

47.     Soon a shuttle arrived, but it came to rest at a location past where the ASE agents had directed Plaintiffs to wait. It then backed into a parking spot and parked at a 45-degree angle to the curb. Plaintiffs heard the driver confirm this was the shuttle for Defendant Wildwood.

48.     Unbeknown to Plaintiffs, the shuttle had parked atop a large patch of ice that covered an area of the parking lot stretching from the sidewalk curb, along the walkway between the parking spots, to the door of the shuttle. It appeared to

Plaintiffs that this large sloping area was a sort of ramp that had been built purposefully for the purposes of walking access to the buildings of the ASE airport and was an unchanging feature of the terrain. If Plaintiffs' assessment was not correct, then it was at least a part of a public road.

49.     Plaintiff Wright was in closest position to board the shuttle and undertook to take several steps toward the open door. She walked 4 to 5 feet toward the shuttle and was approximately halfway to the shuttle door.

50.     Mrs. Wright abruptly slipped on the ice and fell backward. She attempted to brace herself by extending her left arm toward the ground. The impact was jarring and unexpected, as she had believed she was walking on a paved wheelchair ramp/incline and was wearing snow boots while walking with care.

51.     During this moment, the driver John Doe 1 loaded luggage from the other 4 passengers onto the shuttle.

52.     John Doe 1 never acknowledged or paid any attention toward Plaintiffs from the time he parked at ASE through the remainder of the trip to Snowmass and Wildwood.

53.     Plaintiff Wright's fall was noticed by the other 4 passengers, one of which helped her to her feet along with Plaintiff Albury. She remained on the ground for a prolonged and noticeable time before standing with this assistance.

54.     John Doe 1 did not attempt to assist or inquire whatsoever if Plaintiff was hurt or desired medical attention. He simply ignored the situation and attended

to baggage for the white passengers, then got into the driver's seat, waited silently aloof to Plaintiffs while they boarded, then closed the door and drove away.

55.   The Plaintiffs told John Doe 1 that they were staying at Defendant Wildwood. They made conversation with the other passengers and multiple times the topic of the fall was discussed in close proximity to the driver. However, his attention was never affected even to the level of his care for the white passengers' luggage.

56.   John Doe 1 was approaching Wildwood but did not stop and drove directly past it. The driver did not make any effort to get Mrs. Wright any assistance whatsoever. He did not inquire whether Mrs. Wright needed or wanted medical assistance, did not radio to hotel staff about the fall, did not direct them to staff at either hotel, nor do anything to acknowledge their existence except tell them to get off of the shuttle.

57.   John Doe 1 assisted other passengers with all of their luggage and, despite having no option but to turn around and drive once again directly in front of Wildwood, told the Wrights to get out of the shuttle. They got out and had no choice but to walk the 300-400 feet while the white passengers were dropped off perhaps 15 feet away from the door to their hotel.

58.   It would have not required more than 30 seconds at most to stop in front of the Wildwood resort and allow the Plaintiffs to disembark. No explanation was offered by John Doe 1 when the Plaintiffs questioned why they were being told to get off the shuttle, as he was inevitably going to drive past the Wildwood and he knew

Mrs. Wright had fallen only minutes prior while walking approximately 10 feet to the shuttle door.

59.     Plaintiffs again encountered the same shuttle driver when they were leaving for the airport several days later.

60.     Plaintiffs stood outside along with all of their luggage in the spot where Wildwood staff instructed them to wait for the shuttle. However, John Doe 1 drove past Plaintiffs as if they did not exist. The Wildwood staff then confirmed that he should have stopped right in front of the hotel, stated confusion over why he drove past, and undertook to radio him to tell him to come back for the Plaintiffs.

61.     John Doe 1's actions and inattention to Plaintiffs caused them to feel embarrassed, humiliated, and unwelcome. They felt compelled to walk the 300-400 feet to the other hotel with luggage in tow as to ensure they would be able to get on the shuttle. They did not think the driver would otherwise pick them up, even after being called to do so.

62.     He proceeded to load all the white passengers' luggage aboard the shuttle which they had left unattended while boarding the shuttle. It was only after he finished this that he acknowledged Plaintiffs who had been patiently standing with luggage in tow.

63.     Plaintiffs' trip to Aspen, by the actions of John Doe 1, left them feeling out of place, unwelcome, and unimportant because of their appearance and fact of being a different race than the white passengers.

16

64.     After the fall at ASE, through the remainder of the trip, Plaintiff Wright did not have occasion to seek medical treatment or evaluation related to the fall. This was due to an onset of extreme and unrelenting altitude sickness. This was debilitating and incapacitating, such that she did not attempt to go skiing and was unable to focus on anything else.

65.     It was only approximately one week or more after returning to Florida when Plaintiff Wright recovered from her altitude sickness and experienced worsening pain from the fall. She realized her wrist was increasingly sore and not improving.

66.     In other words, it was not immediately apparent to Mrs. Wright nor did she reasonably have occasion to know of her injuries from the fall. Upon information and belief, this circumstance would have been different if John Doe 1 offered any assistance to the Plaintiffs because, for example, she may have been encouraged to seek medical evaluation and/or complete an incident report.

67.     The onset of pain in the following weeks caused Plaintiff to go to the emergency room on February 28, 2020. It was determined that she would require surgery, and upon information and belief, this would have been seen right away if John Doe 1 made effort to inform his superiors of the fall or obtain medical attention for Mrs. Wright.

68.     Mrs. Wright has undergone four surgeries – two to her left wrist and two to her left shoulder, as well as abundant physical therapy and follow up doctor

visits.

69.     As of October 28, 2021, Plaintiff Wright's medical bills totaled over $403,000.00 and since that time continue to accrue.

70.     Plaintiff Wright also lost her job as the recovery period grew far beyond her accrued leave time, vacation days, and sick days. Restrictions on her employment relating to direct risk to her recovery from weightbearing activity.

71.     Plaintiff Wright may never regain full movement in her left shoulder or wrist, per her surgeons' most recent evaluations. She also has permanent nerve damage to her left wrist.

72.     Plaintiff Wright has not worked for an extended time, and prior to that faced a greatly reduced schedule.

73.     Plaintiffs ultimately saw both of them lose their employment and benefits due to the time and extent of care needed by Mrs. Wright. Plaintiff Albury has suffered greatly reduced income and the abundant time and energy needed by a recovering Plaintiff Wright has been a difficult strain on their lives and relationship.

74.     Plaintiffs have had to choose between paying for basic necessities due to their damages. For instance, in Fall 2021, they had to choose to pay rent for the month over making car payment—they could not afford both. Due to this choice the car was repossessed and now Mrs. Wright is without her own means of transportation.

75.     Plaintiff Wright is less than 40 years old but had to incur hundreds of thousands of dollars in medical billing to address the injuries suffered, abundant pain

and suffering, and substantial lost wages as well as a continued lack of employment and health insurance. Plaintiff Wright has numerous scars visible on her arms and wrist.

76.     Both Plaintiffs encountered and continue to face embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

77.     Plaintiffs assert that a white passenger would have been directed to get immediate medical treatment upon suffering a fall like that of Plaintiff Wright.

78.     The walkways leading from shuttle doors to the buildings at ASE were not clear of snow and ice despite over 24 hours of sunshine and only middling flurries the day prior to that. The following are based on information and belief:

a.  The condition of the place where Mrs. Wright fell was a dangerous condition caused by an accumulation of snow and ice that physically interfered with public access on walks leading to the ASE buildings, within the meaning of C.R.S. § 24-100-106(d)(III). In making this allegation, Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of distinguishing cases like *Jones v. City and County of Denver*, 833 P.2d 870 (Colo. App. 1992), and extending the analysis of cases like *Stanley v. Adams Cty. School Dist. 27J*, 942 P.2d 1322 (Colo. App. 1997), which noted that driveways, parking lots, and public walkways are analogous and held that the relevant C.G.I.A. waiver applies only for accumulations of snow and ice, as was the situation here. Plaintiffs also seek an extension of Colorado's rules of

statutory construction to reach holdings that (i) using the word "walks" in a statute that also uses the word "sidewalks" as a defined term requires that the former be read with a different meaning than the latter; (ii) the word "walks" should be interpreted with its plain meaning; (iii) the plain meaning of the word "walks" is that set forth in the Merriam-Webster dictionary as "a place designed for walking"; (iv) the gaps between parking spaces in a parking lot are places designed for walking; and so (v) when a parking lot abuts a public building, the "walks leading to a public building" include reasonable and customary paths from the parking spaces to the doors of the building. Colorado's rules of statutory construction are set forth in a wide body of cases.

b. Alternatively, it was a dangerous condition of a public road in front of the ASE buildings, which physically interfered with the movement of foot traffic on the paved portion, within the meaning of C.R.S. § 24-100-106(d)(I). In making this allegation, Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of modifying the law holding that this waiver of governmental immunity does not apply to county roads. *E.g.*, *Bloomer v. Bd. of Cty. Comm'rs.*, 799 P.2d 942 (Colo. 1990). Alternatively, Plaintiffs seek clarification that this case law is distinguishable for a county-owned parking lot abutting a state highway (in this case, CO-82).

c. Alternatively, it was a dangerous condition of a public facility located within a recreation area, within the meaning of C.R.S. § 24-100-106(e). While the

airport has mixed uses, its primary place is to facilitate recreational travel to the Aspen area. In making this allegation, Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of extending the holding in *Daniel v. City of Colorado Springs*, 327 P.3d 891 (Colo. 2014), that a dangerous condition in a parking lot in a golf course was subject to a C.G.I.A. waiver. *Daniel* provides extensive analysis of what constitutes a public facility in a recreation area, which Plaintiffs seek to extend to apply here, but includes dicta applicable to the Denver International Airport that Plaintiffs seek to distinguish here. The Colorado Supreme Court's analysis of *Daniel* in *Young v. Brighton School Dist. 27J*, 325 P.3d 571 (2014), supports the notion that parking lots designed for the facilitation of travel to recreation areas can result in a waiver. Plaintiffs also seek extension of this analysis.

d.   Alternatively, it was in violation of one or more of the requirements associated with the Board's receipt of federal Airport Improvement Program grant funding, which funding was provided on condition of a waiver of sovereign immunity or other express adoption of a duty of care. In making this allegation, Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of extending and/or modifying the law interpreting C.R.S. § 24-10-104 and arising out of *Ace Flying Serv., Inc. v. Colorado Dept. of Agric.*, 314 P.2d 278 (Colo. 1957). Plaintiffs seek a holding that any adoption of an applicable duty of care, relevant indemnity

agreement, or relevant waiver of immunity agreed to by the Board as a condition of the receipt of federal Airport Improvement Plan funding operates to waive sovereign immunity in this case.

e.  Either way, the Board and actual notice through the ASE staff of the condition of that place as described throughout this Second Amended Complaint.

f.  And, despite that notice, the Board failed to use existing means available to it to clear or mitigate the accumulation of ice and snow.

g.  Specifically, the Board failed to use ice melt, sand, gravel, machines, hand tools, carpets/runners or other traction devices, etc. to protect Mrs. Wright.

h.  Plaintiffs bring this lawsuit in good faith under C.R.S. § 13-17-201(2), for the express purpose of clarifying, extending, and/or modifying the law set forth at C.R.S. § 24-10-106(d). Specifically, this suit seeks to extend/modify existing law to establish that the facts of this case, described throughout this document, constitute an exception to the rule of sovereign immunity within the meaning of the statutes cited above, as previously interpreted by multiple cases, but especially, *e.g.*, *City and County of Denver v. Dennis*, 418 P.3d 489 (Colo. 2018).

79.  The limited signage about snow that was at ASE was not sufficient to warn someone unfamiliar with winter weather of the possibility of ice accumulation several inches thick without there being active snowfall for a significant time prior.

80.  However, by the time this case reaches trial Plaintiffs' combined

economic damages will be toward $1,000,000.00. This is before considering the non-economic damages or the amount that Mrs. Wright is entitled due to permanent injuries and disfigurement.

81.     Upon information and belief, if John Doe 1 had given any assistance or guidance to the Plaintiffs, it is likely that Plaintiff Wright would be facing a significant decrease in pain and recovery time, much less along with less bills and costs for both Plaintiffs.

## V.     Claims for Relief

### FIRST CLAIM - COLORADO PREMISES LIABILITY ACT
### (or negligent maintenance of property)
### Defendant Board

82.     Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

83.     Plaintiffs were injured and one cause of this injury was the failure to maintain the parking lot area at ASE. This occurred as the result of an expected and known accumulation of the ice.

84.     Defendant Board had a duty to prevent Plaintiffs from facing unreasonable danger in the snow and ice on the parking lot of the airport.

85.     Upon information and belief, Board knew that persons who first saw snowfall experienced it in the area where Plaintiff Wright fell, and did so on a regular basis after flying to Aspen to go on vacation at a local ski resort.

86.     Per a Pitkin County job description dated January 2020, this job

entailed responsibilities including: "Monitors, coordinates, and **performs all snow removal operations**; makes strategic decisions based on snowfall; **operates heavy equipment for snow removal from** all runways, taxiways, apron areas, and **customer parking areas;** communicates with ATCT and aircraft; conducts runway friction tests." (emphasis added).[1]

87.   The accumulation of the amount of snow and ice present was an unreasonable risk to the health and safety of the public and including vacationing persons from outside Colorado unfamiliar with snow and ice and the danger these conditions can create.

88.   Plaintiff Wright and her husband Plaintiff Albury are the kind of persons one would expect to be less than fully informed of such dangers and thus fall with in the class of those one would expect to see injured in these circumstances, while at this location.

89.   Upon information and belief, Board knew of the persistent accumulated snow and ice. This is due to, for example, the more than 24 hours passing since any precipitation occurred at all; the Board's staffing related to snow and ice mitigation (the fact that the Board, upon information and belief, staffed employees with ice/snow mitigation duties on the day and at the location of Ms. Wright's fall); the Board's other employees' and agents' presence in the area where Mrs. Wright fell; and only relative

---

[1] Available at:
https://records.pitkincounty.com/WebLink/DocView.aspx?id=316382&dbid=0&repo=LFRecords&cr=1

minimal snowfall occurring during the prior week or more.

90. The doctrine of sovereign immunity is inapplicable and the resulting condition where Plaintiff fell was one which a municipality may properly be held liable for.

91. Without the benefit of sovereign immunity, Board is liable regardless of if the parking lot area where Plaintiff fell will be deemed a walkway or a road.

92. By undertaking to clean up the area between the sidewalk and parking lot, Board faced a continuing obligation to protect foreseeable injured persons such as Plaintiff Wright.

93. The type of injury was foreseeable. The parking lot was dangerous due to a defect in performance of maintenance rather than defect in design.

94. The dangerous condition of the parking lot was due to the proximate act of the ASE personnel in failing to provide shuttle drivers with an adequate safe area to park, and made worse by the affirmative statements of luggage handling personnel who told Plaintiffs a location to stand which actually put them at greater risk.

95. The amount of snow and ice accumulated was unreasonable in the circumstance Plaintiffs encountered, that of vacationers without winter weather experience along with a lack of accumulation 24 hours or more prior to the fall of Plaintiff Wright.

96. The fall caused injuries to Mrs. Wright not discovered immediately but injury which later became apparent and were severe and permanent.

97.   This fall caused Mrs. Wright to suffer damages and Mr. Albury later suffered damages as a result.

98.   According to Pitkin County Code, 10-16-070, Defendant Board required all persons operating commercial transport vehicles on the ASE premises to pay a fee. Code section 10-28-110 establishes further regulations for commercial vehicles that pick up or drop off passengers at ASE.

99.   Defendant Board is liable for the damages Plaintiffs suffered due to the unsafe condition of the airport parking lot area.

### SECOND CLAIM – NEGLIGENCE
### (innkeeper / carrier standard of care – vicarious liability)
### Defendant Wildwood

100.   Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

101.   Defendant Wildwood owed the Plaintiffs a heightened level of care as an innkeeper for Plaintiffs as guests and as principal/employer for John Doe 1 as a driver of a contract carrier.

102.   Plaintiffs were entitled to Defendant Wildwood undertaking care beyond the bare minimum that may be reasonable under other circumstances not involving an innkeeper or carrier.

103.   This includes a duty to mitigate guests' and passengers' harm and any continued risks from injuries that are made known, as Plaintiff's fall was to John Doe 1, imputed vicariously to Defendant Wildwood.

104.   John Doe 1, imputed vicariously to Defendant Wildwood, did nothing to help Plaintiffs in any way. He failed to meet the burden on him, imputed vicariously to Defendant Wildwood, to mitigate likely effects of injuries known to occur on while a person is a guest or passenger.

105.   Defendant Wildwood, including without limitation by and through John Doe 1, failed to account for the likelihood that persons unfamiliar with mountains and winter weather are regularly vacationing to Aspen and cannot be expected to recognize ice and snow as a native Coloradoan would.

106.   John Doe 1, imputed vicariously to Defendant Wildwood, put the Plaintiffs at unnecessary risk by refusing or ignoring the Plaintiffs and thereby denying the opportunity for Mrs. Wright to get immediate medical attention or know that she was in fact injured to the extent it could be seen in imaging.

107.   John Doe 1, imputed vicariously to Defendant Wildwood, is either subject to the duty of an innkeeper to protect guests, or the duty of a contract carrier to protect passengers. This would include the minimum act of informing the Plaintiffs of the presence of ice, or parking somewhere safer in that same parking lot area.

108.   It is a likely that immediate intervention would have eliminated one or more surgeries and significantly reduced recovery time, and increased the likelihood that the Plaintiffs one or both might avoid losing their jobs and insurance benefits.

109.   The Plaintiffs are entitled to the full amount of their damages attributable to Defendant Wildwood, including without limitation through John Doe

1's malfeasance and/or nonfeasance.

110.    Defendant Wildwood is liable to Plaintiffs for the amount they caused unnecessary damages and avoidable worsening of injuries to Plaintiffs.

## THIRD CLAIM - NEGLIGENCE
### (hiring/training/retention/supervision)
### Defendant Wildwood Snowmass

111.    Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

112.    In addition, Defendant Wildwood, directly or vicariously through its agent shuttle service, had a duty to ensure John Doe 1, its employee, agent, or rented employee or agent, knew his inaction towards a person in a circumstance as Mrs. Wright faced could have unacceptable detrimental consequences to that person's life and recovery.

113.    Defendant Wildwood, directly or vicariously through its agent shuttle service, violated a duty to Plaintiffs by failing to train, supervise, reprimand, or hire shuttle drivers properly as to sufficiently ensure their safety.

114.    Defendant Wildwood, directly or vicariously through its agent shuttle service, did not adequately train, supervise, or punish John Doe 1 such that it was a violation of a duty to Plaintiff Wright to fail to ensure the shuttle driver on a mountaintop would be able to act competently in the face of a passenger's injury.

115.    For instance, failing to train and supervise a shuttle driver on what to do when observing a guest/passenger have a fall occur; to not ignore

guests/passengers who say they are in pain; to park in safe areas during pickups; or to treat black guests/passengers the same and no less than all other guests/passengers.

116.    Failure to so adequately train, supervise, reprimand and/or terminate John Doe 1 is a direct harm to Plaintiffs by their experience of apparent racial bias resulting in the denial of full and fair benefit of the accommodations provided by Defendant Wildwood, directly or vicariously through its agent shuttle service.

117.    Plaintiffs are therefore entitled to recover all damages attributable to Defendant Wildwood's negligent training, supervision, control, and discipline as to the driver John Doe 1, directly or vicariously through its agent shuttle service.

## FOURTH CLAIM –VIOLATION OF CIVIL RIGHTS ACT OF 1964, TITLE II
### Defendant Wildwood Snowmass

118.    Plaintiffs incorporate by reference all prior paragraphs herein as if they are fully stated under this cause of action.

119.    Plaintiffs are persons within the meaning of 42 USC § 2000a(a).

120.    Defendant Wildwood Snowmass is a place of public accommodation within the meaning of 42 USC § 2000a(b)(1) because of its status as a lodging.

121.    Defendant Wildwood is therefore by statutory definition an operation affecting commerce under 42 USC § 2000a(c).

122.    Plaintiffs were denied full and equal enjoyment of the services, facilities, privileges, advantages, and/or accommodations of Defendants Wildwood.

123.    As is shown by the actions of John Doe 1, Plaintiffs' race, color, and/or

national origin caused them to be treated less than equal to other guests/passengers who were white. The Plaintiffs were not provided equal enjoyment of the accommodations provided by Defendant Wildwood.

124. The actions of John Doe 1 are attributable to Wildwood Snowmass through agency principles, employment laws, *respondeat superior*, or otherwise.

125. Plaintiffs are entitled to preventative relief, including injunctive relief, restraining order, and other order (specifically including an order of an appropriate deterrent fine) against Defendant Wildwood to address this discrimination. Plaintiffs bring this claim in good faith under C.R.S. § 13-17-201(2), for the express purpose of clarifying, extending, and/or modifying the law related to private suits for public accommodations discrimination. Specifically, 42 U.S.C. § 2000a-3 provides for "preventative relief, including … other order," which should be extended to allow for the recovery of deterrent fines (payable either to Plaintiffs or to an appropriate public interest entity) in cases like this one, in which an injunction may not be the best remedy, as an exception to the rule against recovery of damages as stated in, *e.g.*, *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968).

## VI.   Jury Demand

**PLAINTIFFS DEMAND TRIAL BY JURY**

## VII.   Prayer for Relief

**WHEREFORE**, Plaintiffs pray for entry of judgment in their favor and against Defendants, jointly and severally, on all Counts and causes of action,

including:

(i)     Preventative relief against Defendant Wildwood as just and proper under the Civil Rights Act;

(ii)    An award of damages to compensate for all bodily injuries, medical expenses, disfigurement, permanent impairment, and otherwise allowable for physical harm;

(iii)   An award of damages to compensate for all economic losses and costs incurred by Plaintiffs including lost wages and benefits, and other actual damages incurred;

(iv)   An award of damages for all noneconomic harms, pain and suffering, loss of enjoyment of life, and mental anguish of Plaintiffs and any other such damages suffered;

(v)    An award of punitive or exemplary damages if supported by the facts and evidence developed on the record;

(vi)   An award of attorneys fees as contemplated by 42 U.S.C. § 2000a-3(b) and/or as otherwise awardable under applicable law;

(vii)  For their costs and expenses incurred in pursuit of this action;

(viii) Pre- and post-judgment interest at the prevailing rate;

(ix)   For such other and further relief as may become supported by the evidence, and as this Court finds just and proper in the circumstances.

RESPECTFULLY SUBMITTED at Denver, Colorado, this 24th day of May, 2023.

_s/ Sean M. Dormer_
Sean M. Dormer, Colo. Atty. Reg. 44962
Timothy M. Garvey, Colo. Atty. Reg. 42668
DORMER HARPRING, LLC
3457 Ringsby Court, Unit 110
Denver, CO  80216
Telephone: (303) 756-3812
Facsimile: (303) 477-7400
E-mail:      smd@denvertrial.com
                  tmg@denvertrial.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 24th day of May, 2023, a true and correct copy of the foregoing was served on the following, by electronic filing using the CM/ECF filing system which will send a copy to the following email addresses:

Amy T. Johnson, Esq.
Victoria B. Hambley, Esq.
Lewis Brisbois Bisgaard & Smith LLP
1700 Lincoln Street, Suite 4000
Denver, CO 80203
(303) 861-7760
Amy.johnson@lewisbrisbois.com
Victoria.hambley@lewisbrisbois.com
*Attorneys for Defendants Silvertree Propco, LLC, d/b/a Wildwood Snowmass*

Tiffaney A. Norton, #27428
SGR, LLC
3900 E. Mexico Avenue, Suite 700
Denver, CO 80210
(303) 320-0509
tnorton@sgrllc.com
*Attorneys for Defendant Board of County Commissioners of Pitkin County*

/s/ Marcie Emch
Marcie Emch, Paralegal